UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:11cv0718 (WOB-KKL)

HUSTLER CINCINNATI,
INC., ET AL.                                          PLAINTIFFS

VS.                      MEMORANDUM OPINION AND ORDER

PAUL J. CAMBRIA,
JR., ET AL.                                           DEFENDANTS


This is a legal malpractice action currently before the
Court on defendants' motion for summary judgment (Doc. 85),
which the Court previously took under submission following a
hearing. *See* Doc. 105.

Having further considered this matter, the Court now issues
the following Memorandum Opinion and Order.

### *Factual and Procedural Background*[1]

Hustler Cincinnati, Inc. (now known as JFSG, Inc.) is
wholly owned by plaintiff Jimmy Flynt ("Jimmy").  HCI was formed
in March of 2000.  (Jimmy Flynt Depo., Doc. 78, at 100).  Prior
to forming HCI, Jimmy and his brother, Larry Flynt, formed
Hustler News & Gifts, Inc. ("HNG") in October 1997.

---

[1] A full discussion of the business relationship between Larry
and Jimmy Flynt may be found in *L.F.P.IP, LLC v. Hustler
Cincinnati, Inc.*, Civil Action No. 1:09cv913, 2011 WL 1832702
(S.D. Ohio May 12, 2011), *aff'd*, 533 Fed. App'x 615 (6th Cir.
2013).  The Court will continue its convention of referring to
the Flynt brothers by their first names.

In 1998, Larry and Jimmy were prosecuted for obscenity in Hamilton County, Ohio relating to a sale at HNG. Defendant Paul Cambria ("Cambria") represented Jimmy in this criminal matter. (*Id.* at 19). Cambria had previously represented Jimmy in another criminal prosecution for obscenity in 1977. (Affidavit of Paul Cambria, Doc. 87 ¶ 2). Between 1978 and 1998, Paul Cambria was not representing Jimmy and was not involved with Hustler. (Jimmy Flynt Depo. at 14). After the 1998 prosecution was settled, Cambria was no longer involved in any representation of Jimmy or Hustler until 2001.

In 2001, Cambria, on behalf of his firm Lipsitz Green, negotiated a retainer agreement with Larry to represent Larry Flynt Publications ("LFP"). (*Id.* at 18, 35-36). LFP is the parent company for the Hustler enterprise. (*Id.* at 18). Larry made the decision to retain Lipsitz Green and informed Jimmy of the decision. (*Id.* at 36-37). Jimmy understood Cambria's services would be as "corporate counsel." (*Id.*).

Cincinnati attorney Louis Sirkin ("Sirkin") or his firm represented Jimmy in various transactions between 2000 and 2009. Sirkin filed the articles of incorporation for HCI, (*Id.* at 100, 105); Sirkin drafted a lease for HCI in 2000, (*Id.* at p. 107); Sirkin helped HCI exercise an option from the prior lease to purchase the property at 411 Elm St., (*Id.* at 109); Sirkin

2

represented Jimmy at his divorce deposition in 2003, (*Id.* at 128, 130); Sirkin represented Jimmy in 2003 in a criminal matter growing from the 1998 indictment and settlement, (*Id.* at 135); Sirkin or Sirkin's firm prepared the warranty deed to sell 411 Elm St. to Larry, (*Id.* at 164-65, Ex. 26); another attorney at Sirkin's firm researched pricing for a lease between HCI and Larry; Sirkin's firm represented HCI in an employment matter before the Ohio Civil Rights Commission; Sirkin's firm did legal research on trademarks in 2009; and Sirkin represented Jimmy at a deposition in 2009.

In December 2000, a Hustler Hollywood store opened in Monroe, Ohio, and all shares of the new corporation -- Hustler Hollywood – Ohio, Inc. – were placed in Jimmy's name. Allie Jackson, Jimmy's corporate and personal accountant, testified that the purpose of making Jimmy the owner was to protect Larry from a possible obscenity prosecution that could negatively impact Larry's efforts to obtain a gaming license in California. (Allie Jackson Depo., Doc. 82 at 39).

Hustler Hollywood – Ohio, with Jimmy signing as President, agreed to pay $14,000 in rent to Lakeville Properties, Inc., a company owned by Larry, and it paid $30,000 per month to LFP for the use of the Hustler trademarks. (Allie Jackson Depo. at 36-37). The license fee increased to $65,000 when LFP recognized

3

the store could afford to pay more.  After Defendants were retained, rent increased to $27,000 per month.

In December 2004, Jimmy sold his stock in Hustler Hollywood – Ohio for $150,000, which he repaid to LFP as a licensing fee or for notes payable to LFP.  (Jimmy Flynt Depo. at 186-88; Allie Jackson Depo. at 40-41).  Defendant Joseph Gumkowski testified that a partner of Louis Sirkin represented Jimmy in this transaction.  (Joseph Gumkowski Depo. at 77).

In 2009, a dispute between Larry and Jimmy's sons arose over the sons' use of the Flynt name and trademark in conjunction with an adult DVD business they had started in competition with Hustler.  This dispute resulted in a rift between Larry and Jimmy, and Jimmy was fired from LFP.

Jimmy filed the present action on October 12, 2011, against Cambria, Lipsitz Green, and four other members of the firm. (Doc. 1).  In his Amended Complaint, Jimmy alleges claims for legal malpractice and tortious interference with contractual rights and business relations.  (Doc. 17).

4

*Analysis*

**A.  Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law." *Sharp v. Waste Mgmt., Inc.*, -- F. Supp.3d --, No. 3:12-cv-41, 2014 WL 4638966, at *6 (S.D. Ohio Sept. 16, 2014) (citing *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007)).

"Once 'a motion for summary judgment is properly made and supported, an opposing party may not rely on allegations or denials in its own pleading.'" *Id.* (citing *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010)). "Instead, the party opposing summary judgment must -- by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." *Id.* (internal quotations and citation omitted).

In particular, Rule 56(c) provides that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ.

P. 56(c). Where the opposing party fails to meet this burden, the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

**B. Legal Malpractice**

**1. Direct action legal malpractice.**

"To establish a cause of action for legal malpractice based on negligence, the following elements must be proved: (1) an attorney-client relationship, (2) professional duty arising from that relationship, (3) breach of that duty, (4) proximate cause, (5) and damages." *Shoemaker v. Gindlesberger*, 887 N.E.2d 1167, 1169-70 (Ohio 2008)(citing *Vahila v. Hall* 674 N.E.2d 1164, 1169 (Ohio 1997)).

An express attorney-client relationship exists when the client and attorney have an express agreement to create the relationship. However, even in an express relationship, the scope of representation is limited in the corporate context. "[A]n attorney employed or retained by a corporation represents the organization acting through its constituents; the attorney does not owe allegiance to a stockholder, director, officer, or other person connected with the corporation." *New Destiny Treatment Ctr., Inc. v. Wheeler*, 950 N.E.2d 157, 163 (Ohio 2011).

6

Here, there is no evidence from which a reasonable jury could conclude that an express attorney-client relationship existed between Plaintiffs and Defendants at the time of the alleged malpractice. Plaintiffs argue that Defendant Cambria represented Jimmy in various criminal prosecutions between 1976 and 2004 and thus was Jimmy's attorney moving forward. Defendants assert that Cambria represented only Larry in the challenged transactions, and it was Lou Sirkin who represented Jimmy from 2001 to 2009. But even if Cambria represented Jimmy for these criminal indictments, it has nothing to do with the transactions at issue in this case. The attorney-client relationship can automatically terminate when the attorney completes the discrete task for which he was retained. *Kouba v. Climaco.*, No. 38585, 1979 WL 210054 (Ohio Ct. App. 1979). Thus, Cambria's representation of Jimmy in certain criminal matters does not mean Cambria also represented Jimmy for all of his legal needs into the future.

In addition, Plaintiffs specifically pled that the attorney-client relationship at issue here began in late 2000 or early 2001 when Larry orally retained Lipsitz Green. (Doc. 17 ¶ 42, Amended Complaint). Further, Jimmy testified that Alan Isaacman was outside general counsel for Hustler until Cambria was hired, and that Cambria was not doing any legal work for

7

Larry before he was hired. (Doc. 78 pp. 15, 31, Jimmy's Deposition). Thus, Defendant Cambria's prior representation of Jimmy in criminal matters does not support Plaintiffs' contention that it shows he "remained" Jimmy's attorney simply because he "never advised Jimmy that they ceased being his attorneys." (Doc. 99 p. 23).

Plaintiffs assert that Jimmy and Jackson "were advised the retainer agreement included Jimmy and his wholly-owned entities." (Doc. 99 p. 23). A review of Jimmy's deposition does not support the assertion that he was specifically told the retainer with Lipsitz Green included Jimmy and HCI. Instead, Jimmy testified that he believed that Lipsitz Green represented him because he was Larry's partner. (Jimmy Flynt Depo. at 43). [2] However, Jimmy was not Larry's partner. *L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 619 (6th Cir. 2013).

Jimmy never testified that Larry specifically told him that Cambria would represent Jimmy and HCI. Instead, Jimmy understood that Cambria did not represent him for any criminal matters unless he was separately retained and paid. (*Id.* at

---

[2] "Q: . . . Since you considered yourself Larry's partner in 2001, as far as you were concerned, Lipsitz Green was also your lawyers?

A. Yes." (*Id.* at 43).

43).  In addition, Jimmy testified that he viewed Cambria as corporate counsel.  (*Id*. at 37).[3]

Further, plaintiffs fail to cite to any specific portion of Allie Jackson's deposition, and a thorough review of his testimony reveals no assertion that he was told that Lipsitz Green represented HCI.

Allie Jackson also testified that he did not receive a bill to pay the Lipsitz Green firm for any work they did for HCI. (Allie Jackson Depo. at 104-05).[4]  It is undisputed that the firm represented LFP on its corporate matters and that HCI is not part of LFP.

Further, there are no bills from Lipsitz Green to HCI or Jimmy, there is no engagement letter, and there was no oral retainer agreement between Jimmy/HCI and anyone at Lipsitz Green.[5]  Thus, there is no evidence from which a reasonable juror

---

[3] "Q. Yeah. I think you're probably reading more into my question than was there. What I'm focused on right now, Jimmy, is the time, what Larry told you that he -- that Paul was going to do for the million dollars a year.
A. Corporate counsel, was how we looked at it. Being specific, you know."  (Doc. 78 p. 37).

[4] Jackson also testified that Lipsitz Green drafted a "prototype" for HCI's pension plan but he did not remember if HCI was billed for it.  (*Id*. at 92-93).

[5] Plaintiffs produced a bill purportedly sent to Jackson for payment.  However, on the face of the document it is addressed to "Larry Flynt c/o LFP" and not to Jimmy Flynt or HCI.  (Doc.

9

could conclude that there was an express attorney-client relationship between the Plaintiffs and Defendants.

However, the attorney-client relationship may also be implied. *Cuyahoga Cnty. Bar Assn. v. Hardiman*, 798 N.E.2d 369, 373 (Ohio 2003) ("While it is true that an attorney-client relationship may be formed by the express terms of a contract, it can also be formed by implication based on conduct of the lawyer and expectations of the client.") (quotations omitted). "To establish an implied attorney-client relationship, plaintiff Jimmy Flynt must show (1) he submitted confidential information to the defendant attorneys during the time that the defendants represented the Larry Flynt Companies, and (2) that he did so with the reasonable belief that the defendant attorneys were acting as his personal attorney." (Doc. 71, Magistrate Judge Litkovitz Order, (citing *Nilavar v. Mercy Health System–Western Ohio,* 143 F.Supp.2d 909, 913 (S.D. Ohio 2001)).

"The determination of whether an attorney-client relationship was created turns largely on the reasonable belief of the prospective client." *Hardiman*, 798 N.E.2d at 373. "[T]he test for determining the existence of an attorney-client

99 Ex. 2). In addition, Jimmy testified he was unaware of any bills from Defendants to Plaintiffs. (Jimmy Flynt Depo. at 241). Further, Cambria testified "there are no bills between Jimmy Flynt, as a person, as opposed to an employee, and this firm." (Paul Cambria Depo. at 143).

relationship is both a subjective and objective test." *Stuffleben v. Cowden*, No. 82537, 2003 WL 22805065, at ¶ 22 (Ct. Ap. Ohio 2003).

An attorney-client relationship "exists when an attorney advises others as to their legal rights, a method to be pursued, the forum to be selected, and the practice to be followed for the enforcement of their rights." *Landis v. Hunt*, 610 N.E.2d 554, 558 (Ohio 1992) (citing *In re Unauthorized Practice of Law in Cuyahoga Cnty.*, 192 N.E.2d 54 (Ohio 1963)). Further "[a]n essential element as to whether an attorney-client relationship has been formed is the determination that the relationship invoked such trust and confidence in the attorney that the communication became privileged and, thus, the information exchanged was so confidential as to invoke an attorney-client privilege." *Id.* However, "payment of a fee is not an essential element" to establish an attorney-client relationship. *Id.*

Jimmy testified that defendants Reina, Gumkowski, Brown, and Deal never gave him legal advice in his personal capacity or to HCI. (Jimmy Flynt Depo. at 243-45). There is also no testimony regarding what confidential information, if any, Jimmy submitted to these attorneys. Therefore, these four defendants did not have an attorney-client relationship with Jimmy or HCI

11

because they gave him no advice and he submitted no confidential information to them.

In contrast, Paul Cambria discussed many confidential issues with Jimmy. However, they all related to Jimmy's position as an employee with LFP and not to Jimmy personally or his role within HCI. Jimmy testified that his position with Hustler Hollywood required him to interact with company counsel, which would be Cambria and the LG firm. (Jimmy Flynt Depo. at 80). Cambria testified that, between 2001 and 2009, he never provided any legal advice to Jimmy personally or to any company Jimmy owned. (Paul Cambria Depo. at 80-81, 92). Plaintiffs have failed to cite to any record evidence that could create a genuine issue of material fact on this issue. Thus, Cambria did not have an attorney-client relationship with Plaintiffs.

Plaintiffs argue their experts reviewed the entire factual record and opined that an attorney-client relationship existed between Plaintiffs and Defendants. However, the expert reports rely on a statement of facts provided by Plaintiffs. (Doc. 90 p. 2, John C. Scott's Expert Report; Doc. 91 p. 5, Geoffery Stern's Expert Report). The Plaintiffs' statement of facts is not supported by the record.

Plaintiffs' statement of facts, which the experts assumed were true, states: "Jimmy was aware that a yearly retainer

12

agreement had been reached with Cambria/LG." (Doc. 91 p. 24, Geoffery Stern's Expert Report). This fact is supported by the record. (Doc. 78 p. 35). But the statement of facts continues: "Jimmy reasonably believed that the retainer agreement was intended to include and cover his legal interests and needs and that Cambria was now general counsel for him, his brother and the enterprise." (Doc. 91 p. 24.) This statement is not supported by any cited record evidence, and Jimmy's testimony contradicts this factual statement. (Jimmy Flynt Depo. at 37)[6]

In one email, not specifically cited by Plaintiffs, Paul Cambria stated: "You are the one who is always bringing Lou up to me and to Larry about everything. If you want Lou as your general counsel ask Larry to replace me but get off my back I am working my balls off for your brother and all I get are calls that you are complaining about me[.]" (Doc. 76-1 p. 10). This statement in isolation could allow a jury to infer that Cambria was stating he was Jimmy's counsel. However, Jimmy's response to Cambria defeats this inference. Jimmy states: "You are LFP's

---

[6] "Q: . . . What I'm focused on right now, Jimmy, is the time, what Larry told you that he – that Paul was going to do for the million dollars a year.

A: Corporate counsel, was how we looked at it. Being specific, you know."

Chief Counsel and I respect that." (*Id.*) This is another example of Jimmy affirming his understanding that Cambria represented LFP rather than him or HCI.

Further, while plaintiffs named Lipsitz Green as a defendant, in Ohio a law firm cannot commit legal malpractice but can be only held vicariously liable for the malpractice of its attorneys. *Natl. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth* 913 N.E.2d 939, 943, 945 (Ohio 2009)("[W]e hold that a law firm does not engage in the practice of law and therefore cannot directly commit legal malpractice." "[W]e hold that a law firm may be vicariously liable for legal malpractice only when one or more of its principals or associates are liable for legal malpractice.") Thus, the legal malpractice claim against Lipsitz Green also fails.

Defendants provided evidence that none of them gave advice to or received confidential information from Plaintiffs. It is then the Plaintiffs' burden to direct the Court to any record evidence supporting their allegations that Defendants were Plaintiffs' attorneys. Plaintiffs have failed to do so. Thus, Plaintiffs malpractice claim fails against all Defendants as a matter of law.

14

## 2. Privity and Malice exception to legal malpractice.

The privity/malice exception to legal malpractice is not applicable in this case. The general rule is that an "attorney is immune from liability to third persons arising from his performance as an attorney in good faith on behalf of, and with the knowledge of his client, unless such third person is in privity with the client or the attorney acts maliciously." *Scholler v. Scholler*, 462 N.E.2d 158, 163 (Ohio 1984) (quoting *Petrey v. Simon*, 447 N.E.2d 1285, 1288 (Ohio 1983)).

Ohio adheres to a strict privity rule. *Shoemaker v. Gindlesberger*, 887 N.E.2d 1167, 1171 (Ohio 2008). This is a public policy intended to protect an "attorney's duty of loyalty and the attorney's effective advocacy for the client." *Id*. "The strict privity rule ensures that attorneys may represent their clients without the threat of suit from third parties who may compromise that representation." *Id*. Failure to adhere to a strict privity rule could lead to poor legal services to clients. *Id*. at 230. In addition, "without the strict privity rule, the attorney could have conflicting duties and divided loyalties during the estate planning process" and may be opened up to unlimited liability. *Id*.

The focus of the strict privity inquiry is on the mutuality of interest between the client and third-party. *Scholler*, 462

15

N.E.2d at 163-64 (finding that a child could not sue his mother's attorney for failing to obtain proper child support in a separation agreement because the mother's interest in obtaining a fair division of marital assets is not concurrent to the interest of the child to receive support); *see also McGuire v. Draper, Hollenbaugh & Briscoe Co., L.P.A.*, No. 01CA21, 2002 WL 31521750, at ¶ 63 (Ohio Ct. App. 2002) (concluding that there was no mutuality of interest to create privity).

The mutuality of interest is focused on the relationship between the attorney's client and the third-party. *Sayyah v. Cutrell*, 757 N.E.2d 779, 787 (Ohio Ct. App. 2001). To determine whether privity exists "the trial court must first examine the interest that the original attorney-client relationship was intended to protect and then compare it to the interest of the third person bringing suit for the alleged legal malpractice." *Id*. Thus, "[p]rivity exists if the interest of the client is concurrent with the interest of the third person." *Id*.

For the privity exception to apply in this case, Plaintiffs must meet the strict privity standard and show a mutuality of interest between Jimmy and Larry. However, a central theory of Plaintiffs' claims is that Larry's and Jimmy's interests were **not** aligned and Defendants' failure to notify Plaintiffs of this conflict was legal malpractice. If Jimmy's (the third-party)

16

interest was not "concurrent" with Larry (the client), then no mutuality of interest existed and Jimmy and Larry were not in privity.  Thus, the privity exception does not apply.

The malice exception is also inapplicable.  "[T]he Ohio Supreme Court suggested that an attorney acts maliciously if he acts with intent to defraud a third party, or with 'malice' or 'bad faith,' but did not amplify those terms." *Wilkey v. Hull*, 598 F. Supp. 2d 823, 832 (S.D. Ohio 2009) *aff'd,* 366 F. App'x 634 (6th Cir. 2010).  "Regarding malice, the court cited abuse of process and malicious cases to note that malice includes 'actions taken by the attorney with an ulterior motive separate and apart from the good-faith representation of the client's interests.'" *Id*.

Plaintiffs fail to cite to any record evidence from which a reasonable jury could conclude that Defendants acted maliciously and not in good faith.  Plaintiffs cite to Jimmy's belief that these actions were taken so that Cambria could enrich himself, but no evidence has been presented to substantiate this belief. This is not enough to raise a genuine issue of material fact. Thus, the malice exception is inapplicable.

**C. Defendants did not tortiously interfere with Jimmy's employment rights, business relationship, or contractual/expectancy interests. Plaintiffs concede their civil aiding and abetting claim.**

Counts II, III, and IV of the Plaintiffs' complaint are tortious interference with employment rights, business relations, and contractual/expectancy interests, respectively. These claims have very similar elements.

**1. Count II: Employment Rights.**

"[T]he Supreme Court of Ohio set forth the elements for a claim of tortious interference as follows: (1) the existence of an employment relationship, (2) the wrongdoer's knowledge of the employment relationship, (3) the wrongdoer's intentional procurement of the termination of the employment relationship, (4) *lack of justification,* and (5) resulting damages." *Doyle v. Fairfield Mach. Co., Inc.*, 697 N.E.2d 667, 683 (Ohio App. Ct. 1997). Later cases have removed the lack of justification prong from tortious interference with employment rights. *McNett v. Worthington*, No. 15-11-05, 2011 WL 4790759, at ¶ 18 (Ohio App. Ct. 2011)(citing *Lennon v. Cuyahoga Cnty. Juvenile Court*, No. 86651, 2006 WL 1428920, at ¶ 19, (Ohio App. Ct. 2006).

Plaintiffs' complaint alleges that Jimmy "was paid at an executive level, had job security, lifetime employment, a generous expense account and decision-making authority." (Doc. 17 ¶ 133, Amended Complaint). Plaintiffs allege that Defendants

18

"tortuously [sic] inferred [sic] with Jimmy's contractual employment rights resulting in Jimmy's wrongful termination . . . ." (*Id.* at ¶ 134). However, it has already been judicially determined that Jimmy did not have a lifetime employment contract, but was instead an at-will employee. *L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, No. 1:09CV913 WOB, 2013 WL 27494 (S.D. Ohio Jan. 2, 2013) *aff'd,* 533 F. App'x 615 (6th Cir. 2013)("At the partnership trial, Jimmy merely testified that, in 1988, he and Larry 'agreed to put things behind us and move on with our partnership.' He also expressly rejected the proposition that he was an 'employee.' No mention was made of any promise to Jimmy of lifetime or indefinite employment or any agreement between the two men regarding such an arrangement.") (citations omitted).

As this Court also previously stated:

Jimmy's allegation that a contract of lifetime employment was created because Larry promised him "indefinite/continued" employment runs afoul of the following principle:

Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages.

19

*L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 2013 WL 27494, at *3 (citing *Henkel v. Educ. Research Council of Am.*, 344 N.E.2d 118, 121-22 (Ohio 1976)).

Thus, Plaintiffs' claim cannot be one where liability is based on the termination of a lifetime employment contract but a claim based on the Defendants' interference with Plaintiffs termination as an at-will employee.

Plaintiffs argue that a jury could reasonably conclude that Cambria induced Larry to fire Jimmy because Larry testified that Cambria did not like Jimmy. Further, Plaintiffs argue that Defendants interfered with Jimmy and Larry's long-term employment and business relationship "by encouraging, directing, and suggesting that Jimmy's pay and benefits be stopped and that he be terminated without cause." (*Id.*) However, Plaintiffs fail to cite to any record evidence showing Defendants took any of these actions.

Further, Defendants point to record evidence to the contrary. Larry testified that he did not consult with Cambria before terminating Jimmy, that Cambria did not encourage him to terminate Jimmy, and that neither Cambria nor anyone from his firm helped orchestrate the firing of Jimmy. (Larry Flynt Depo. at 30). Plaintiffs' failure to cite to any record evidence to contradict this testimony dooms their claim. No reasonable

20

juror could conclude that any Defendant interfered with Jimmy's employment rights and Plaintiffs' claim fails.

### 2. Count III: Business Relationship

"The elements of tortious interference with a business relationship are (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and (4) damages resulting therefrom." *Geo-Pro Serv., Inc. v. Solar Testing Labs., Inc.*, 763 N.E.2d 664, 672 (Ohio App. Ct. 2001).

Plaintiffs allege that "Jimmy has a business relationship/arrangement with Larry/Hustler" and that Defendants "without privilege or justification, induced or otherwise purposely caused Larry/Hustler to terminate Jimmy's business arrangement/relationship resulting in damages to Jimmy . . . ." (Doc. 17 ¶¶ 136-37).

It is unclear what business relationship Plaintiffs are alleging was interfered with by Defendants. However, assuming Plaintiffs are alleging interference with Jimmy's relationship with Larry as a partner of Hustler, this Court and the Sixth Circuit already held that Jimmy was not a partner with Larry. *L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 1:09CV913 WOB, 2013 WL 27494 (S.D. Ohio Jan. 2, 2013) *aff'd,* 533 F. App'x 615 (6th Cir. 2013)("This Court has previously rejected Jimmy's claim

that he and Larry were partners; thus, no fiduciary relationship exists on that basis.")

If the business relationship is one between HCI/Jimmy and Larry/LFP, including trademark rights and leasehold rights, then the claim still fails. The claim is for tortious interference, but Defendants bringing claims on behalf of Larry to enforce Larry/LFP's right is not tortious interference with a business relationship. Plaintiffs would have to present evidence that Defendants did something tortious to cause Larry to bring these claims. *Geo-Pro Serv., Inc. v. Solar Testing Labs., Inc.*, 763 N.E.2d 664, 672 (Ohio App. Ct. 2001)("The tort of interference with a business relationship occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another.") Plaintiffs have cited to no record evidence showing that Defendants tortiously interfered with Plaintiffs' and Larry/LFP's business relationship. Thus, Defendants are entitled to summary judgment.

### 3. Count IV: Expectancy Interest

The elements for tortious interference with expectancy of inheritance are: "(1) an existence of an expectancy of inheritance in the plaintiff; (2) an intentional interference by a defendant(s) with that expectancy of inheritance; (3) conduct

by the defendant involving the interference which is tortious, such as fraud, duress or undue influence, in nature; (4) a reasonable certainty that the expectancy of inheritance would have been realized, but for the interference by the defendant; and (5) damage resulting from the interference." *Firestone v. Galbreath*, 616 N.E.2d 202, 203 (Ohio 1993).

Plaintiffs have cited to no record evidence from which a reasonable jury could infer that Defendants tortiously interfered with an expectancy of inheritance. Larry testified that estate planning was not part of his retainer with Lipsitz Green and that attorney Rick Corletta, who has no affiliation with the firm, did his estate planning. (Larry Flynt Depo. at 14-15). Larry further testified that after firing Jimmy he amended his trust, that Rick Corletta did that work, that he never promised Jimmy a fifty-percent interest in his trust, and that he did not seek advice from Lipsitz Green before making changes to his trust. (*Id.* at 30-31).

Plaintiffs assert that Larry promised Jimmy "continued compensation/retirement as secured by the Larry Flynt Trust." (Doc. 99 p. 41). However, even if this is enough to establish a genuine issue of material fact on the first element, that an expectancy of inheritance existed, Plaintiffs claim still fails.

23

Plaintiffs have cited no record evidence indicating that Defendants "by fraud, duress or other tortious means" intentionally prevented Jimmy from receiving his inheritance. Jimmy's subjective belief, without evidence, is not enough to create a genuine issue of material fact on this issue. Even if Cambria became a co-trustee at the time Jimmy was removed from the trust, it is not evidence that Cambria removed Jimmy utilizing fraud, duress, or other tortious means.

Plaintiffs argue that a jury "could conclude that Cambria's interference with Jimmy's expectancy interest was motivated to exact revenge on Jimmy and/or to otherwise increase/improve Cambria's position, control, influence, and/or financial interest in the trust/Hustler in the years to come." (Doc. 99 p. 42). Even if Cambria had such motivation, the interference would still have to be tortious, that is, by fraud, duress, or undue influence. Plaintiffs' failure to present any evidence from which an inference of such tortious conduct could be drawn defeats their claim as a matter of law.

### 4. Plaintiffs' civil aiding and abetting claim was abandoned.

"[T]he Ohio Supreme Court has clarified that [civil aiding and abetting] is not recognized under Ohio common law. As such, Plaintiffs are no longer pursuing that

24

claim."  (Doc. 99 at 1, Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment.)

Therefore, having reviewed this matter, and the Court being sufficiently advised,

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. 85) be, and is hereby, **GRANTED**.  A separate judgment shall enter concurrently herewith.

This 14th day of October, 2014.



Signed By:

*William O. Bertelsman* WOB

**United States District Judge**